8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Saul H. Catalan and
Mia Morris

Plaintiffs,

v.

RBC MORTGAGE CO., d/b/a RBC Centura Bank and GMAC Mortgage Corp.,

Defendants.

No. 05C 6920

**FILED**

DEC - 8 2005 rq

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

JURY DEMANDED JUDGE LINDBERG

MAGISTRATE JUDGE NOLAN

**COMPLAINT**
**MATTERS COMMON TO MULTIPLE COUNTS**

**PRELIMINARY STATEMENT**

1. This action seeks redress for the illegal practices of defendants, RBC Centura Bank ("RBC") and GMAC Mortgage Corp.,("GMAC") in connection with the servicing of residential mortgage loans. Plaintiffs allege claims under the Cranston-Gonzales amendments to the Real Estate Settlement Procedures Act, 12 U.S.C. §2605(b)-(f) against RBC Centura Bank and GMAC Mortgage Corp. as well as claims for Gross Negligence and Wrongful Foreclosure/Breach of Contract.

**JURISDICTION**

2. This Court has jurisdiction under 28 U.S.C. §1331 (general federal question), 28 U.S.C. §1337 (interstate commerce) and 28 U.S.C. §1367 (supplemental jurisdiction). Venue in this District is proper because defendants do business here.

**PARTIES**

3. Plaintiffs Saul H. Catalan and Mia Morris are husband and wife who

4. Defendant RBC Centura is a federally-chartered Bank.

5. Defendant GMAC Mortgage Corporation is a federally-chartered mortgage corporation.

6. RBC Centura Bank makes and services numerous loans which are "federally related mortgage loans" as defined in 12 U.S.C. §2602, in that they are secured by a lien on residential real property designed principally for the occupancy of from one to four families, and in that they are made by "creditors" which make or invest in residential real estate loans aggregating more than $1,000,000 per year.

7. GMAC Mortgage Corporation makes and services numerous loans which are "federally related mortgage loans" as defined in 12 U.S.C. §2602, in that they are secured by a lien on residential real property designed principally for the occupancy of from one to four families, and in that they are made by "creditors" which make or invest in residential real estate loans aggregating more than $1,000,000 per year.

**FACTS**

8. On or about June 25, 2003, plaintiffs obtained a residential loan from RBC Centura Bank.

9. Pursuant to the June 25, 2003, mortgage and note, plaintiffs were required to begin making their mortgage payments to RBC on August 1, 2003 in the amount of $1,598.05. This amount included all escrow items.

10. Plaintiffs timely mailed their first mortgage payment to RBC in the amount of $1,598.05.

11. Plaintiffs timely mailed their second mortgage payment to RBC in the amount of $1,598.05.

12. On or about September 5, 2003 Plaintiffs sent a letter to RBC stating that the first payment on the mortgage had not been posted to their account. The letter requested that all payments be posted to their account timely.

13. On September 22, 2003, RBC sent plaintiffs a letter stating that their loan remains in default for $2,165.26. The letter from RBC did not acknowledge nor address plaintiffs' requests in their September 5, 2003 letter.

14. On October 3, 2003, RBC sent a generic default letter stating that their loan was in default for $3,952.38 from August 1, 2003 through October 6, 2003 and due for November 5, 2003. This letter did not acknowledge plaintiffs correspondence or address the correspondence in any matter.

15. On October 11, 2003, Plaintiffs sent a letter to RBC disputing all late payments and informing RBC that the August 1, 2003 payment was cashed on August 20, 2003 and that September 1, 2003 payment was cashed on September 18, 2003. Plaintiffs' letter again requested that their payments be posted and applied to their account on a timely basis.

16. On October 17, 2003, RBC sent plaintiffs a letter stating that it had received a payment of $1,598.05 but the amount was not correct. The letter further stated that the correct amount of the mortgage payment was $1,787.12. Plaintiffs had not received any previous correspondence indicating that their payments had increased.

17. RBC's October 17, 2003 letter is incorrect as the mortgage, note and payment coupon all state the monthly payment, including all escrow items, was $1,598.05.

18. On November 10, 2003, Plaintiffs sent a letter to RBC disputing the payment amount and again requested a review and correction on their account.

19. On January 5, 2004, RBC sent a letter to plaintiffs stating that there was a default of $7,802.17 for September 1, 2003 to January 5, 2004 and stating that payment must be made by February 4, 2004.

20. On January 16, 2004, RBC sent a letter to plaintiffs stating that the mortgage loan was due for September 1, 2003. This letter did not acknowledge nor address any issues raised by plaintiffs in their previous letters to RBC.

21. On January 16, 2004, plaintiffs received another letter from RBC stating that their payment of $1,598.05 was being returned because it was not the correct amount. The letter further stated that $9,022.08 was needed in order to bring the account current.

22. On February 6, 2004, RBC sent plaintiffs a letter stating that their mortgage had been referred for foreclosure.

23. On February 20, 2004, RBC sent plaintiffs a letter stating that it was returning plaintiffs' payment of $1,598.05 as it was not the correct amount.

24. On February 26, 2004, RBC sent plaintiffs a letter stating that their mortgage loan had been referred for foreclosure and the current balance was $231.420.00.

25. On March 1, 2004, plaintiffs sent a letter to RBC requesting that it provide them with answers to why payments were not posted timely, confirmation on monthly payment amount and disclosure of all activity on account.

26. On March 15, 2004, RBC sent plaintiffs a letter stating that their payment of $1,598.05 was being returned as the amount was not sufficient to bring the account current. The letter also stated that the account was due from September 1, 2003

through February 4, 2004 and that the account was referred for foreclosure as of February 6, 2004.

27. On April 19, 2004, plaintiffs received a letter from RBC stating that their payment of $1,598.05 was being returned as the amount was not sufficient to bring the account current. The letter also stated that the account was due for September 1, 2003 through February 4, 2004.

28. On April 19, 2004, plaintiffs sent a letter to RBC that again requested a review of the account and requested an answer to why payments were returned.

29. On April 19, 2004, plaintiffs also sent an e-mail to RBC requesting it provide an explanation of all activity on account

30. On April 20, 2004, RBC via e-mail acknowledged plaintiffs' e-mail correspondence of April 19, 2004. The e-mail from RBC informed plaintiffs that Jeff Buckley would conduct an investigation on account and that he would contact plaintiffs upon completion of this investigation.

31. On April 28, 2004, plaintiffs sent a letter to RBC's foreclosure department again requesting a review of the account. The letter also requested an explanation as to why payments were returned and why account placed in foreclosure.

32. On April 28, 2004, plaintiffs sent an e-mail to Mr. Buckley of RBC requesting that information regarding their account be provided to them.

33. On April 29, 2004, plaintiffs sent an e-mail to RBC's dispute resolution department requesting resolution to its servicing problems on plaintiffs' account.

34. On April 30, 2004, plaintiffs sent another e-mail to RBC requesting an explanation as to why RBC would place a call to her home without leaving a message.

32. On April 30, 2004, plaintiffs received an e-mail from an employee of RBC, Christy Roach, stating that she was trying to reach plaintiffs by telephone and that plaintiffs should contact her at 1.800.59.1012.

33. On May 6, 2004, plaintiffs received an e-mail from Christy Roach stating that plaintiffs' mortgage loan had been taken out of foreclosure and requested the checks that were returned by RBC.

34. On May 12, 2004, plaintiff sent a letter to Christy Roach requesting that she accept mortgage payments and requested an explanation as to why the account was placed in foreclosure in the first place. The letter also enclosed the checks requested and included the May 2004 payment.

35. On May 17, 2004, plaintiffs received an e-mail from Christy Roach acknowledging that Ms. Roach received plaintiffs' package of information including the checks from January 2004 to May 2004. Christy Roach's e-mail to plaintiffs requested copies of cancelled checks from September 2003 to December 2003 that RBC cashed. The e-mail acknowledged that plaintiffs would probably have to get the copies from their bank.

36. On June 11, 2004, plaintiffs sent Christy Roach copies of cancelled checks and also included the June 2004 payment.

37. On June 25, 2004, Christy Roach sent plaintiffs an e-mail informing them that the matter was referred to management in the Mortgage Loan Servicing department because there was another issue with the payment amount and payment due date.

38. On June 25, 2004, plaintiffs sent Christy Roach another e-mail

requesting an update on the status of their account and requested confirmation of when payments would be posted to their account.

39. On June 29, 2004, plaintiffs sent another e-mail to Christy Roach requesting information as to why someone was taking pictures of their home.

40. On June 29, 2004, Christy Roach sent plaintiffs an e-mail informing them that their account was placed back into foreclosure because of the time it took them to receive the package of cancelled checks plaintiffs mailed to them in May 2004.

41. On July 13, 2004, the RBC foreclosure was dismissed without any explanation by RBC.

42. On August 12, 2004, plaintiffs sent Christy Roach a letter requesting an accounting of payments and status on account.

43. On September 5, 2004, plaintiffs sent Christy Roach RBC a letter that included a replacement check for the payment that was returned by RBC.

44. On September 23, 2004, GMAC sent a letter to plaintiffs indicating that it needed evidence of hazard insurance. Plaintiffs did not know why GMAC would need information concerning their mortgage.

45. On September 27, 2004, GMAC sent a letter to plaintiffs informing them that their payment of $1,598.05, which was made payable to RBC, was being returned and that account was due for five (5) installments beginning May 1, 2004.

46. On October 7, 2004, plaintiffs sent a letter to GMAC disputing the information contained in its September 27, 2004 letter, including disputing the amount owed, requested account transfer information and informed GMAC that they never received a letter indicating that GMAC was now the new servicer on the mortgage loan.

47. On October 13, 2004, GMAC sent plaintiffs a letter in response to plaintiffs' letter dated October 7, 2004. GMAC's letter informed plaintiffs that account transferred to them on September 1, 2004 with a principal balance of $229,098.02 and that account was due for May 1, 2004 for $1,661.97.

48. On October 15, 2004, GMAC sent a generic plaintiffs a letter informing them that their loan was in default for $9,843.98.

49. On October 15, 2004, plaintiffs sent Christy Roach of RBC a letter requesting an explanation of when the account was transferred and why RBC was receiving the mortgage payments when the account was referred to GMAC.

50. On October 15, 2004, plaintiffs sent GMAC a letter requesting information on the transfer of the account and requested information as to who was entitled to receive payments on the mortgage loan account.

51. On October 18, 2004, GMAC sent plaintiffs a generic letter informing them that their mortgage loan continues to be in default and threatened foreclosure. The letter from GMAC did not acknowledge or address any issues previously raised in numerous correspondence to them by plaintiffs.

52. On October 20, 2004, GMAC sent plaintiffs an another generic letter that provided a summary on account and indicated that payment amount of $1,598.05 due for May 1, 2004.

53. GMAC sent plaintiffs on a On October 21, 2004 letter responding to a letter written to it by the Department of Housing and Urban Development ("HUD"). The letter from GMAC indicated that plaintiffs' mortgage was transferred to it effective



September 15, 2004 and that the account was due for May, June, July, August and September 2004.

54. GMAC's letter to HUD is completely one sided and accuses plaintiffs of numerous late payments and avoiding contact with GMAC when nothing can be further from the truth.

55. GMAC's October 21, 2004, letter to HUD contradicts its October 13, 2004, letter to plaintiffs, which stated that the loan was transferred effective September 1, 2004 and not September 15, 2004 as represented to HUD.

56. On October 25, 2004, GMAC sent plaintiffs a letter informing them that their loan was in default and threatened foreclosure.

57. On November 15, 2004, plaintiffs sent a letter to GMAC that included seven (7) payments totaling $11,186.35. Plaintiffs' letter requested that GMAC process the payments timely, that they be informed of any changes to the account in writing only and requested acknowledgment of all previous inquiries they made on their account.

58. On December 2, 2004, plaintiffs sent a letter to GMAC requesting that it apply the check sent to them in November 2004 by plaintiffs in the amount of $11,186.35.

59. On December 9, 2004, plaintiffs sent GMAC a letter that included the current mortgage payment and requested that it be applied promptly.

60. On December 13, 2004, GMAC sent plaintiffs a letter that informed that plaintiff that it was returning payment of $11,186.35 as the account had been referred to attorney for foreclosure.

61. On December 17, 2004, plaintiffs sent GMAC's attorney, Codilis &



Associates a letter disputing the balance and requested explanation of the increase in the mortgage monthly payment.

62. December 22, 2004, GMAC sent plaintiffs a letter that indicated that it was returning plaintiffs' payment of $1,598.05 as the account had been referred to its attorney for foreclosure.

63. On December 22, 2004, Codilis & Associates sent plaintiffs a letter that acknowledged their previous inquiry and informed plaintiffs that it had forward the plaintiffs' inquiry to GMAC for review and research.

64. On December 23, 2004, GMAC sent plaintiffs a letter acknowledging their inquiry requesting information on account and informed plaintiffs that it would respond to them within 20 days.

65. On December 30, 2004, GMAC sent plaintiffs a letter acknowledging their inquiry requesting information on account and informed plaintiffs that it would respond to them within 20 days.

66. GMAC never responded to the letter and apparently had no intention to do so as evidenced by the fact that it foreclosed on the property on November 24, 2004.

67. GMAC attempted to serve plaintiffs at their relatives homes without ever attempting to serve plaintiffs at their home. In addition, plaintiffs neighbors saw listings that plaintiffs home was being foreclosed.

68. Plaintiffs endured a lengthy second foreclosure that was ultimately dismissed after HUD provided its assistance.

69. As a direct result of defendants' actions plaintiffs could not refinance



their home loan at the current market rates, denied a business loan, their credit rating was ruined, they were in constant fear that they will lose their home, suffered extreme emotional distress for which medical assistance was received, and emotional distress for GMAC's invasion of their privacy as GMAC attempted to serve plaintiffs at their relatives homes without ever attempting service at their home.

## COUNT I -- CRANSTON-GONZALES AMENDMENT

70. Plaintiffs incorporate ¶¶1-69.

71. The Cranston-Gonzales amendment to the Real Estate Settlement Procedures Act, 12 U.S.C. §2605(e), provides:

> **(e) Duty of loan servicer to respond to borrower inquiries.**
>
> **(1) Notice of receipt of inquiry.**
>
> **(A) In general. If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.**
>
> **(B) Qualified written request. For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that–**
>
> **(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and**
>
> **(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to**

the servicer regarding other information sought by the borrower.

(2) Action with respect to inquiry. Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall–

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes–

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes–

(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

(3) Protection of credit rating. During the 60-day period beginning on the date of the servicer's receipt from any borrower of a



**qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 603 of the Fair Reporting Act [15 USC §1681a]).**

72. RBC violated §2605(e)(1)(A) by failing to acknowledge plaintiffs' letters within 20 business days. The letters were qualified written requests as defined by RESPA.

73. GMAC violated §2605 (e)(1)(A) by failing to acknowledge plaintiffs' letters within 20 business days. The letters were qualified written requests as defined by RESPA.

74. RBC and GMAC violated §2605(e)(2)(A)and(B) by failing to take any actions, including corrective action, required by §2605(e)(2)(A)and(B) in regards to numerous letters. The letters were qualified written requests as defined by RESPA.

75. RBC and GMAC violated §2605(e)(2)(c) by reporting plaintiffs as delinquent to a credit bureau or bureaus within 60 days from receiving numerous letters which disputed the amount owed. The letters were qualified written requests as defined by RESPA.

76. 12 U.S.C. §2605(f) provides:

**(f) Damages and costs. Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:**

**(1) Individuals. In the case of any action by an individual, an amount equal to the sum of--**

**(A) any actual damages to the borrower as a result of the failure; and**



> **(B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $ 1,000.**
>
> **(3) Costs. In addition to the amounts under paragraph (1) or (2), in the case of any successful action under this section, the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances.**

77. As a result of RBC and GMAC violating §2605(e) plaintiffs could not refinance their home loan at the current market rates, denied a business loan, their credit rating was ruined, were in constant fear that they will lose their home, suffered extreme emotional distress for which medical assistance was received, and emotional distress for GMAC's invasion of their privacy as GMAC attempted to serve plaintiffs at their relatives homes without ever attempting service at their home.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against RBC and GMAC for:

(1) Statutory damages for each violation as provided in 12 U.S.C. §2605(f).

(2) Actual damages.

(3) Attorney's fees, litigation expenses and costs pursuant to 12 U.S.C. §2605(f).

(4) Such other or further relief as the Court deems appropriate.

**COUNT II – GROSS NEGLIGENCE**

78. Plaintiffs incorporate ¶¶1-77.

79. RBC was plaintiffs' mortgage servicer from about June 25, 2003 to about August 31, 2004.

80. GMAC was plaintiffs' mortgage servicer from about September 1, 2004 to the present.

81. RBC had a duty to service plaintiffs' loan by applying all mortgage payments promptly and correcting servicing errors immediately.

82. GMAC had a duty to service plaintiffs' loan by applying all mortgage payments promptly and correcting servicing errors immediately.

83. RBC and GMAC breached their duties.

84. Plaintiffs' were damaged as a result in that RBC and GMAC wrongfully stopped accepting timely payments, filed foreclosure proceedings on their home and damaged their credit.

85. RBC and GMAC acted with such gross negligence as to indicate a wanton disregard of the rights of plaintiffs.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against RBC and GMAC for:

(1) Actual and punitive damages.

(2) A declaration that Plaintiffs were not in default of their loan with RBC and GMAC.

(3) Such other or further relief as the Court deems appropriate.

**COUNT III – WRONGFUL FORECLOSURE/BREACH OF CONTRACT**

86. Plaintiffs incorporate ¶¶1-85.

87. Plaintiffs executed a Note and Mortgage, which required them to

make monthly mortgage payments.

88. RBC and GMAC were responsible for accepting the monthly mortgage payments and applying those funds as set out in the Note.

89. At all times, plaintiffs timely made their monthly mortgage payments.

90. RBC and GMAC wrongfully stopped accepting the timely payments and for filing foreclosure proceedings on their home.

91. Plaintiffs were damaged as a result.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against RBC and GMAC for:

(1) Actual damages.

(2) A declaration that Plaintiffs were not in default of their loan with RBC and GMAC.

(3) Such other or further relief as the Court deems appropriate.

**COUNT IV - - WILLFUL AND WANTON CONDUCT**

92. Plaintiffs incorporate ¶¶1-91.

93. RBC and GMAC acted in a wilful and wanton manner by:

(A) Purposefully and deliberately filing foreclosure proceedings on plaintiffs' home despite assurances that it would resolve the problem;

(B) Refusing to accept plaintiffs' monthly mortgage payments that were timely submitted.

94. RBC and GMAC wilfully and wantonly engaged in the above acts for their own financial gain at the expense of plaintiffs.

95. As a result, plaintiffs were damaged.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against RBC and GMAC for:

(1) Actual and punitive damages.

(2) Such other or further relief as the Court deems appropriate.

Attorney for Plaintiffs

Keith J. Keogh
Law Offices of Keith J. Keogh, Ltd.
227 W. Monroe St., Ste. 2000
Chicago, Illinois 60606
312.726.1092 (office)
312.726.1093 (fax)
Keith@KeoghLaw.com

**JURY DEMAND**

Plaintiffs demand trial by jury.

Keith J. Keogh